UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Randi Lynn Erickson,                                    File No. 21-cv-2536 (ECT/DJF)

      Plaintiff and Counter-Defendant,

v.                                                                    **OPINION AND ORDER**

Craig Randall Sawyer,

      Defendant and Counter-Claimant.

---

Randi Lynn Erickson, *pro se*.

Brendan R. Tupa and Oluwatoni Ojoyeyi, Messerli Kramer, Minneapolis, MN for Defendant and Counter-Claimant Craig Randall Sawyer.

---

*Pro se* Plaintiff Randi Lynn Erickson filed this lawsuit originally against three Defendants who she alleged had threatened her in retaliation for her efforts to combat human trafficking. Erickson's Complaint was dismissed without prejudice for lack of subject-matter jurisdiction in March 2022. *Erickson v. Sawyer*, No. 21-cv-2536 (ECT/ECW), 2022 WL 911966 (D. Minn. Mar. 29, 2022). Before Erickson's Complaint was dismissed, however, one of the Defendants, Craig Randall Sawyer, filed a defamation counterclaim against Erickson seeking compensatory and punitive damages and injunctive relief. ECF No. 20. Erickson failed to answer or otherwise respond to Sawyer's counterclaim, so the Clerk entered default. ECF No. 57.

Sawyer now seeks entry of a default judgment that would, if issued, "grant injunctive relief requiring the removal of online postings about Sawyer and forbidding

future defamatory publications against Sawyer by Erickson, enjoin Erickson from future filings in this matter, and any others, without a licensed attorney or court approval, award Sawyer his attorney's fees, and enter a monetary judgment of $1,100,000 in compensatory damages and $1,265,000 in punitive damages for a total damage award of $2,365,000 in favor of Sawyer and against Erickson."  Mem. in Supp. [ECF No. 63] at 2.

A default judgment will be entered for Sawyer, though for lesser amounts than he requests and without injunctive relief or attorneys' fees.  Sawyer will be awarded $250,000 in compensatory damages and $250,000 in punitive damages.  On the record presented by Sawyer, these are reasonable awards.  Much of the injunctive relief Sawyer requests would be legally inappropriate.  To the extent he seeks legally appropriate injunctive relief, it is difficult to see what practical benefit Sawyer might gain from the requested relief in view of the counterclaim's allegations.  The authority under which Sawyer seeks attorneys' fees, 28 U.S.C. § 1927, does not warrant the imposition of sanctions against Erickson.

The basic process for determining whether a default judgment should be entered is straightforward.   (1) The entry of default means that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."  10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 2688.1 (4th ed. & April 2022 Update) (footnotes omitted).  (2) Next, it must be determined whether the taken-as-true factual allegations of the operative pleading—here, the counterclaim—"constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."  *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010) (quoting *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010)).  (3) If the taken-as-true allegations of the complaint

constitute a legitimate cause of action, then the amount of the default judgment must be ascertained. *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1042 (8th Cir. 2000).

I

A

Start with the factual allegations of Sawyer's counterclaim that will be taken as true. Sawyer is an Arizona citizen. Countercl. [ECF No. 20] ¶ 6. He "is a veteran of the United States Marine Corps and a former Navy Seal, having served on the elite Seal Team 6." *Id.* "Since leaving military service, Mr. Sawyer has maintained a prominent niche in public life relating to his military expertise, including involvement with multiple television broadcasts and documentaries." *Id.* ¶ 7. "Mr. Sawyer's success in many of his ventures depends on maintaining a favorable public profile and reputation." *Id.*

"In 2017, Mr. Sawyer founded Veterans for Child Rescue, Inc. (V4CR), an organization devoted to rescuing victims of child sexual abuse." *Id.* "Sawyer subscribes to a Christian world view, which includes the views that Satanism and Satanic pedophilia are gravely evil, and that child sexual abuse is a heinous crime against Almighty God, against humanity, and against the young victims. [He] has lived his life, raised his family, established his career, and built his reputation, both publicly and privately, on these values." *Id.* ¶ 10. "Mr. Sawyer currently leads a ministry specifically devoted to exposing the evils of satanic pedophilia and/or aiding the victims of such crimes." *Id.* "Mr. Sawyer has never met Ms. Erickson, never spoken with her, and has no relationship with her." *Id.* ¶ 11.

3

Erickson is a Minnesota citizen.  *Id.* ¶ 8.  "She proclaims to be a 'sovereign citizen' and a member of a task force that gathers actionable intelligence of international crimes with the United States Army Intelligence Support Activity under the name Pentagon Pedophile Task Force."  *Id.*

At the counterclaim's core are a series of allegations concerning statements Erickson has published or republished regarding Sawyer.  These are described generally in the counterclaim as follows:

> Beginning around November 2018, Ms. Erickson along with cohort Timothy Charles Holmseth began publishing a multitude of false and defamatory statements against Mr. Sawyer.  Ms. Erickson relies on Jessie Marie Czebotar as her source for many of her false and defamatory allegations.  Ms. Czebotar claims that she witnessed a murder by Mr. Sawyer, as well as several murders by Hillary Rodham Clinton in Chicago in the early 1980s, which included the raping, torturing, and eating of children during satanic rituals, while Mr. Sawyer watched.  Ms. Czebotar names several politicians, celebrities, and other high-profile individuals, such as Ronald Reagan, Bill Clinton, Joe Biden, Newt Gingrich, Dick Cheney, Dan Quayle, Mike Pence, John Kerry, Muammar Gaddafi, Amy Coney Barrett, and Elon Musk to name a few, as being involved in some Satanic cult that tortures, rapes, murders, and eats children.  Because of the spectacular nature of Ms. Czebotar's claims, her credibility is broadly questioned across the internet and elsewhere[.]

*Id.*

The Counterclaim also includes more particularized allegations regarding specific statements made by Erickson.  "Ms. Erickson operates two websites located on the internet [at] www.timothycharlesholmseth.com, and www.writeintoaction.com, and posts video content on the internet along with Mr. Holmseth at www.bitchute.com, YouTube, Twitter,

4

and Facebook." Countercl. ¶ 12.  Mr. Sawyer alleges that several of Ms. Erickson's

postings are defamatory:

- "For example, on April 28, 2021, Mr. Sawyer announced that he would be a speaker at a faith conference in Dallas in May 2021.  Afterward, Ms. Erickson contacted event organizers and guests telling them that Craig Sawyer is a human trafficker who raped a child."

- "On May 25, 2021, Ms. Erickson published on the internet at: https://www.bitchute.com/video/DKkMnF5p75iO/, that Craig Sawyer is an 'accused Clinton human trafficker,' who 'allegedly raped a child,' led a 'life of crime,' 'committed more interstate wire fraud,' 'pedophile,' 'child-sex offender,' and 'attempting to kidnap and kill . . . Timothy Charles Holmseth.'"

- "Ms. Erickson and Mr. Holmseth have a special section on their website dedicated to . . . Mr. Sawyer located at: https://timothycharlesholmseth.com/?s=CRAIG+SAWYER, which has over 100 postings mentioning Mr. Sawyer with false . . . statements, including, but not limited to, stating that Mr. Sawyer is a 'child rapist,' 'serial killer,' 'contract killer,' 'pedophile,' 'drug trafficker,' potential presidential assassin, and that he 'formed a heavily armed domestic terror group and kidnapping operation,' that is 'ripping people off and working with human traffickers as a way to make himself appear to be anti-trafficking.'"

- On October 15, 2021, Erickson posted a "video" of a "recorded phone conversation between Ms. Erickson and Robert Cottle, a preparedness programs administrator for the Texas Office of the Governor.  Beginning at 1:38, Ms. Erickson states that Craig Sawyer is 'involved with child trafficking, and [she] has proof of that . . . internationally.'  Such an allegation is completely false. . . . Beginning at 10:14, Ms. Erickson states that Mr. Sawyer is 'operating an independent . . . battleground on child trafficking, but he has not rescued one child.'  This is false . . . as the V4CR has made 23 arrests with a 100% conviction rate as a result of its joint sting operations with law enforcement."

- On November 5, 2021, "Ms. Erickson published an apparent account from Adrian John Wells that states that he was kidnapped from his family home in Australia in 1984. Then, Mr. Wells was transported by Mr. Sawyer to a U.S. Army and Hollywood Police pedophile ring involving Harvey Weinstein, then to Arkansas for a pornography deal with Bill Clinton and Hillary Clinton, then to New York City where he was raped by a U.S. Army Soldier in the bed of a New York City Apartment, possibly owned by then Senator Joe Biden. Mr. Wells then states that he was tortured by the CIA under arrangements made by Michael Flynn. This video also posts excerpts from an affidavit of Jessie Czebotar . . . which describes incidences in a suburb of Chicago, Illinois, between 1981 and 1984, involving Hillary Rodham Clinton along with Mr. Sawyer serving as her protector. Ms. Czebotar's affidavit states that she witnessed torture and murder of a man who tried to escape the 'Luciferian System.' Further, Ms. Czebotar's affidavit states that she witnessed Mrs. Clinton murder four girls around the age of 10, but not before torturing them, sexually abusing them, and actually eating parts of their bodies--all while Mr. Sawyer was present, watching, and yelling at the children to 'Quit crying you little babies.' This video has been viewed over 16,000 times."

*Id.* ¶¶ 13–16.[1] "Ms. Erickson's internet video publications as described above were published with deliberate intent and with Ms. Erickson knowing the accusations to be false or in reckless disregard of the truth." *Id.* ¶ 27. "Further, Ms. Erickson published them with knowledge that Mr. Sawyer would suffer the injuries described" in his counterclaim. *Id.*

"Ms. Erickson in conjunction with Mr. Holmseth has caused irreparable injury to Mr. Sawyer's reputation, profession, trade, and businesses through her continued false and slanderous publications accusing Mr. Sawyer of engaging in, among other things, the

---

[1]    Sawyer attached as an exhibit to his counterclaim "[a]n exemplary list of 79 videos published by Ms. Erickson and Mr. Holmseth with their dates, titles, and links to their locations on the internet" and alleges that the "videos have been viewed several thousand times." Countercl. ¶ 17.

most heinous crimes of pedophilia, child-sex trafficking, and murder." *Id.* ¶ 19.  Erickson's

publications have caused Sawyer to suffer "public hatred, contempt, ridicule and aversion,"

*id.* ¶ 21, have "create[d] hostile and unsavory opinions about Mr. Sawyer in the minds of

a substantial number of people," *id.* ¶ 22, have "dissuade[d] people [from] associating with,

supporting, and contributing to [Sawyer] and his businesses and organizations," *id.* ¶ 23,

and have "cause[d] and encourage[d] others to republish her defamatory statements on their

own social media accounts, thereby further increasing the audiences who hear and view

the [statements]," *id.* ¶ 25.  "Mr. Sawyer will continue to suffer such injury into the future

. . . unless Ms. Erickson is restrained from publishing and republishing her false,

groundless, . . . accusations that Mr. Sawyer is engaged in the most heinous of crimes." *Id.*

¶ 29.

## B

The case's procedural history is somewhat unusual.  Erickson filed her Complaint

in November 2021.  ECF No. 1.  Sawyer moved to dismiss the Complaint for improper

venue and failure to state a claim on which relief may be granted.  ECF No. 4.  One of

Sawyer's co-defendants, Robert Hamer, subsequently joined in Sawyer's motion.  ECF

No. 14.  In March 2022, Erickson's Complaint was dismissed *sua sponte* for lack of

subject-matter jurisdiction because she alleged no state claims to invoke diversity

jurisdiction and she failed to identify a substantial federal question, and Sawyer and

Hamer's motions seeking dismissal on venue and merits grounds were denied as moot.

ECF No. 53.

Between January and March 2022, Erickson filed a series of groundless motions. *See* ECF Nos. 10, 11, 28, and 36. She also filed several affidavits and many pages of exhibits. *See* ECF Nos. 13, 15, 19, 21–35, 37, and 40–42. Erickson's motions were denied in three orders. ECF Nos. 16, 18, and 53. Though the purpose of Erickson's affidavits and exhibits was not clear, they were allowed simply to occupy the docket.

On February 15, 2022—after he filed his Rule 12 motion but before the Complaint was ordered dismissed—Sawyer filed an Answer and Counterclaim. ECF No. 20.[2] Erickson filed no response to Sawyer's counterclaim; she lodged no objection to its filing on any ground, including timeliness. On March 9, 2020, Sawyer moved under Rule 12(f)(2) to strike Erickson's various affidavits and exhibits and moved under Rule 55(a) for default judgment. ECF No. 43. Because these motions were procedurally improper, they were denied. ECF No. 54. The following week, Sawyer applied for the Clerk's entry of default, ECF Nos. 55–56, and the Clerk entered Erickson's default on April 15, ECF No. 57. Sawyer originally scheduled a hearing on his default-judgment motion for August 1, 2022. After missing the deadline to file papers in connection with that hearing date, ECF No. 58, the hearing was rescheduled and took place on November 28, 2022, ECF

---

[2] One might reasonably question the procedural propriety of filing an *answer* after filing a Rule 12(b) motion and before the motion is decided. Regardless, Rules 12 and 13 do not seem to prohibit a defendant from filing a Rule 12(b) motion and a *counterclaim*. *See* Fed. R. Civ. P. 12(b), 13. Also, though Erickson's Complaint was dismissed for lack of subject-matter jurisdiction, that does not prevent the exercise of subject-matter jurisdiction over Sawyer's counterclaim, provided it alleges an independent basis for subject-matter jurisdiction. 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 1414 at 130 (3d ed. 2010). Sawyer's counterclaim plausibly alleges the presence of diversity jurisdiction under 28 U.S.C. § 1332(a). Countercl. ¶¶ 6, 8, and at 14 ¶¶ A–C, E.

No. 72.   At the hearing, Sawyer declined the opportunity for an evidentiary hearing, explaining that any testimony he might offer in such a hearing would be identical to his affidavit testimony and that the record would not otherwise change.

## II

## A[3]

"Under the common law, a plaintiff pursuing a defamation claim 'must prove that the defendant made: (a) a false and defamatory statement about the plaintiff; (b) in [an] unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community.'" *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 873 (Minn. 2019) (quoting *Weinberger v. Maplewood Rev.*, 668 N.W.2d 667, 673 (Minn. 2003)).[4]  "A statement is defamatory when it 'tend[s] to injure the plaintiff's reputation and expose the plaintiff to public hatred, contempt, ridicule, or degradation.'" *Phipps v. Clark Oil & Refin. Corp.*, 408 N.W.2d 569, 573 (Minn. 1987) (quoting *Church of Scientology of Minn. v. Minn. State Med. Ass'n Found.*, 264 N.W.2d 152, 155 (Minn.1978)).  "[T]he common law recognizes privileges, both absolute and qualified, that operate to defeat a defamation claim." *Maethner*, 929 N.W.2d at 873.  "Absolute privilege means that immunity is given

---

[3]     Sawyer argues that Minnesota law governs his claims in this case in light of Erickson's Minnesota citizenship. *See* Mem. in Supp. at 9–15.  There is no good reason to second-guess Sawyer's position.

[4]     It doesn't end up making a difference, but to be clear, I understand the Minnesota Supreme Court's formulation of the claim's elements in *Maethner* to mean that it is a plaintiff's burden to show that the defamatory statement's publication was unprivileged. On other occasions, the Court has described privilege as a defense to a defamation claim. *E.g.*, *Harlow v. State of Minn., Dep't of Human Servs.*, 883 N.W.2d 561, 569 (Minn. 2016) (describing "privilege[s] as defenses to a defamation claim").

even for intentionally false statements, coupled with malice." *Matthis v. Kennedy*, 67 N.W.2d 413, 416 (Minn. 1954). "A qualified privilege is overcome if the plaintiff demonstrates that the defendant made the statement with malice." *Maethner*, 929 N.W.2d at 873. "Malice under the common law means that the defendant made the statement 'from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.'" *Id.* (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980)). "[A] defamation plaintiff generally must establish harm to reputation." *Id.* at 874. But harm to reputation is presumed in cases of defamation *per se*—that is, cases involving "'false accusations of committing a crime and false statements about a person's business, trade, or professional conduct.'" *Id.* at 875 (quoting *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987)).

The analysis changes somewhat if the plaintiff is a public official or public figure. "The First Amendment prohibits public officials or public figures from recovering damages for defamatory falsehoods concerning issues of public interest and concern unless they prove that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020) (cleaned up) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)); *see also Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 329 (Minn. 2000) (defining "actual malice" and noting that "it is important to distinguish between 'actual malice' and 'common law malice'"). "[T]he public figure category is broader than persons who by reason of pervasive fame and notoriety become public figures for all purposes." *Nelson*,

951 F.3d at 956 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).   "'More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'"   *Id.* (quoting *Gertz*, 418 U.S. at 351).   Whether a defamation plaintiff is a public figure depends on context— specifically "by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz*, 418 U.S. at 352; *see also Chafoulias v. Peterson*, 668 N.W.2d 642, 651 (Minn. 2003) (identifying three factors as determinative of the limited-purpose-public-figure question: "(1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy").

The analysis is similar if a private plaintiff—that is, a plaintiff who is not a public official or public figure—sues a defendant for defamatory statements involving a matter of public concern. *Maethner*, 929 N.W.2d at 876–79.   In this situation, the plaintiff must also establish "actual malice." *Id.*   There is not a bright line between statements that involve a matter of public concern and statements that do not.   As the Minnesota Supreme Court explained in *Maethner*:

> Notwithstanding the importance of the distinction between a public concern and a private concern in determining the constitutional protections afforded to speech in tort actions, the Supreme Court has acknowledged that "the boundaries of the public concern test are not well defined." *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004).   But the Court has "articulated some guiding principles." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).   In *Snyder*, the Court explained that "[s]peech deals with matters of public concern when it can be fairly considered

as relating to any matter of political, social, or other concern to the community" or when the subject of the speech is "of general interest and of value and concern to the public." *Id.* at 453 (citations omitted) (internal quotation marks omitted). But the Court made clear that the subject of the speech is not the only consideration.    According to the Court, "[d]eciding whether speech is of public or private concern requires" an examination of "the 'content, form, and context' of that speech, 'as revealed by the whole record.'" *Id.* (quoting *Dun & Bradstreet*[*, Inc. v. Greenmoss Builders, Inc.*], 472 U.S. [749,] 761 [(1985)]).

*Maethner*, 929 N.W.2d at 880.  Relevant considerations include, for example, the subject or subjects of the speech, the location of the speech, and whether it was designed to reach a broad audience.  *See id.* at 881.

B

The taken-as-true factual allegations of Sawyer's counterclaim plainly meet the common law defamation claim's basic elements.  The many statements Sawyer alleges Erickson made to the effect that Sawyer is a human trafficker, a pedophile, child rapist, a serial killer, and so forth are defamatory.  They obviously would tend to injure Sawyer's reputation and expose him to public contempt.  The statements are also false.  It is enough in this procedural context that Sawyer alleges the statements are untrue.[5]    The counterclaim's allegations give no reason to think that any of Erickson's many statements

---

[5]    One might reasonably question whether some of Erickson's more absurdly fantastical statements could reasonably be believed and, in turn, defame Sawyer.  For example, statements that Sawyer conspired with prominent public figures in the ritualistic raping, torturing, and eating of children are like asserting that these same people engage in extraterrestrial trafficking on Pluto.  That some of Erickson's statements fall in this category doesn't change the result here.  Many of her statements are not so nonsensical, and Sawyer plausibly alleges that these statements were believed and harmed his reputation.

12

were privileged.  There is, for example, no allegation that any of her statements were made in a judicial proceeding, as part of a report to law enforcement, or in any other conceivably privileged context.  Though many of Erickson's statements are defamatory *per se*—at least because she accuses Sawyer of multiple crimes, including false imprisonment, child sexual assault, and murder—Sawyer's allegation that Erickson's statements have caused significant, irreparable injury to his reputation and business interests is established by virtue of Erickson's default.

This determination—that the counterclaim's taken-as-true allegations constitute a legitimate cause of action for defamation—holds if one concludes that Sawyer was required to show actual malice.  The counterclaim's allegations that Sawyer has maintained a "prominent niche in public life" and that he founded and leads "an organization devoted to rescuing victims of childhood sexual abuse," Countercl. ¶ 7, might fairly be understood to make Sawyer at least a limited-purpose public figure with respect to the subject of child sexual abuse—the principal subject of Erickson's defamatory statements.   And the counterclaim's allegations regarding the content, form, and context of Erickson's statements might reasonably be construed to show that the statements involve a matter of public concern.  If the content of Westboro Baptist Church members' speech addressed "broad issues of interest to society at large," *Snyder*, 562 U.S. at 454, then so did much of Erickson's.  Though many of her statements were directed at Sawyer, many others were directed at groups of national government and political figures and subjects like domestic terrorism.  Most of Erickson's statements were made online in websites and formats designed to reach—and, as Sawyer alleges, did reach—an extensive audience.  The actual-

malice determination follows, not merely because Sawyer alleges it, Countercl. ¶ 27, but also because it is difficult to imagine how Erickson's statements—considering their frequency, substance, and outrageousness—could have been made without her knowledge of their falsity or her reckless disregard for whether the statements were false.

### III

Even after a defendant's liability is established, a plaintiff seeking a default judgment "must still prove its actual damages to a reasonable degree of certainty." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818–19 (8th Cir. 2001). "A district court may determine damages by computing from the facts of record the amount that the plaintiff is lawfully entitled to recover and enter judgment accordingly." *Radisson Hotels Int'l, Inc. v. Fairmont Partners LLC*, No. 19-cv-1176 (WMW/BRT), 2020 WL 614810, at *2 (D. Minn. Feb. 10, 2020). Under Minnesota law, damages available to Sawyer include harm to his reputation and community standing, mental distress, humiliation, embarrassment, physical disability, and any economic loss, to the extent these are caused by Erickson's defamatory statements. *See* 4 Minn. Dist. Judges Ass'n, Minn. Practice, Jury Instruction Guides—Civil, JIG 50.55 (6th ed. 2021 & Oct. 2022 Update). The determination that Erickson acted with actual malice also makes punitive damages available to Sawyer. Minn. Stat. § 549.20; *see also Stokes v. CBS Inc.*, 25 F. Supp. 2d 992, 1003 (D. Minn. 1998).

Sawyer requests that he be awarded "$1,100,000 in compensatory damages and $1,265,000 in punitive damages." Mem. in Supp. [ECF No. 63] at 23. This request draws support from essentially three sources. *First*, there are damages allegations in Sawyer's

counterclaim.  These are quite general.  *See* Countercl. ¶¶ 2, 19, 21–25, 28–29, 32, 36, 38, and at 14 ¶¶ A–E (following request for relief).  *Second*, Sawyer has filed an affidavit in which he describes how Erickson's statements have injured him.  Sawyer Aff. [ECF No. 67].  Sawyer testified, for example, that "Erickson has done immense intentional damage to me, my family, and our organization for children, Veterans for Child Rescue." *Id.* ¶ 3.[6] He testified to a series of emotional harms.  These include feeling "stunned and distraught," hurt, bewildered, assaulted, and degraded, *see id.* ¶¶ 4, 6, 17, feelings Sawyer testified are amplified because Ericksons statements are so at odds with his faith, his service to the country, and his work through Veterans for Child Rescue, *see id.* ¶¶ 4, 7, 17.  Sawyer testified that Erickson's statements have caused a cutback in support for his activities, *id.* ¶¶ 12, 14, and "greatly damaged [his] reputation in the Christian community," *id.* ¶ 18. And he testified that he has lost "public support, moral support, law enforcement, and film and television friendships and alliances." *Id.* ¶ 21.  *Third*, Sawyer has filed a default judgment entered in his (and three others') favor in the Stark County, Ohio Court of Common Pleas.  ECF No. 68.  In that case, captioned *Hagmann v. Lee*, Case No. 2020CV00494, the court entered default judgment for Sawyer on a defamation claim involving statements comparable to Erickson's made by a defendant, Daniel John Lee.  *Id.* at 4–5 (describing statements made regarding Sawyer).  Following an evidentiary hearing, the court awarded Sawyer $1,000,000 in compensatory damages, and it awarded Sawyer

---

[6]     Because they are not plaintiffs in this case, damages cannot be awarded for harms suffered by Sawyer's family members or his organization.  The task is to determine an appropriate damages award for the harms Sawyer personally suffered.

and his three co-plaintiffs $1,150,000 in punitive damages, apparently jointly.  *Id.* at 5–7. That court based its compensatory damages award largely on testimony and exhibits showing "extraordinary" harm to Sawyer's reputation and a "loss of confidence" in Sawyer's non-profit work.  *Id.* at 6.  The court based its punitive damages award essentially on the magnitude of defendant Lee's actual malice.  *Id.* at 6–7.

These sources plainly establish that Sawyer has suffered, and likely continues to suffer, significant reputational injury and mental anguish caused by Erickson's defamatory statements, but these sources do not support a judgment in the amount Sawyer seeks.  The counterclaim's allegations are too general to be of use in ascertaining a damages award. Sawyer's affidavit is more specific.   It includes credible descriptions of substantial reputational injuries, mental distress and anguish, and embarrassment.  It does not include other information indicative of more severe injuries.  It omits, for example, testimony showing that Sawyer's mental-distress injuries were severe enough to prompt him to seek mental-health care or other medical treatment, and it includes no testimony showing that Sawyer personally suffered economic loss.  The default judgment entered in the Ohio court is informative, but its usefulness is undercut by the fact that it was issued following an evidentiary hearing concerning statements made by a different defendant.  Further, though Sawyer asserts that he should receive the punitive-damages amount awarded in the Ohio case increased by ten percent for inflation, the order in that case makes clear that the $1,150,000 in punitive damages was awarded collectively to the four plaintiffs in that case. Assuming each plaintiff shared equally in that award, Sawyer's portion would be $287,500.

On this record, I conclude that Sawyer is entitled to a compensatory-damages judgment of $250,000.  Several primary considerations lead me to award this amount: (1) The content of Erickson's statements is extreme.  It is difficult to imagine content more defamatory than accusing another of being a pedophile, child rapist, kidnapper, fraudster, and serial killer.  (2) Erickson made many statements.  Sawyer has introduced evidence of dozens of such statements.  (3) Erickson deliberately made these statements in a manner intended to reach an audience that is at least nationwide.  She utilized the Internet to publish her statements.  Notwithstanding their outrageous content, the record shows that Erickson found a wide audience for her statements.  (4) Sawyer has testified that he has suffered, and continues to suffer, significant reputational injury and mental anguish caused by Erickson's defamatory statements.  In view of the statements' content, frequency, and scope of publication, and in view of the obvious contradictions and problems such statements would pose given Sawyer's faith, past service, and present-day charitable work, I find that Sawyer's injury-specific affidavit testimony is credible.  (5) No doubt, Sawyer has had to endure embarrassment and devote considerable time to answering the statements and countering their deleterious effects on him personally.  (6) It is true that Sawyer's damages testimony is not very particular, but in view of the nature of damages awards in defamation cases generally, his testimony and the larger record are sufficiently specific to permit the ascertainment of damages with a reasonable degree of certainty.  (7) Viewed alone, these considerations arguably justify a higher award than $250,000.  I decline to make a higher award based largely on the absence of evidence showing that Sawyer's mental distress has been more severe—there is, for example, no evidence showing that

Sawyer has required mental-health or medical care—and on the absence of evidence showing that Sawyer has sustained identifiable economic loss resulting from Erickson's statements.

I also conclude that Sawyer is entitled to a punitive-damages judgment of $250,000. The legal basis for this award follows from the earlier conclusion that Erickson acted with actual malice. The actual-malice standard—that a person publishes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not," *Nelson Auto Ctr.*, 951 F.3d at 956—mirrors the standard for awarding punitive damages under Minnesota law. Minn. Stat. § 549.20 subdiv. 1. Several considerations lead me to conclude that $250,000 is the right amount, *see* Minn. Stat. § 549.20 subdiv. 3: (1) Erickson's defamatory statements were outrageous, frequent, and intended to reach the widest possible audience. (2) Erickson encouraged and caused others to republish her defamatory statements, multiplying the injuries her own statements caused. (3) Sawyer has received death threats owing to similar statements made by others. ECF No. 68 at 6. It is thus reasonable to infer that the hazards arising from Erickson's statements are quite serious and extraordinary. (4) Erickson published her statements over an extended period—at least several months. (5) Erickson's conduct and filings in this case suggest that she remains defiant and intent on injuring Sawyer. She has filed multiple declarations and many pages of exhibits in this case in which she seems bent on defending her position and statements. It is bewildering that she went to the trouble of filing these voluminous materials but chose not to respond to Sawyer's counterclaim. Regardless, there is a demonstrated need for deterrence. (6) This amount is close to the punitive damages

awarded by the Ohio court, and it bears a reasonable 1:1 relationship to the compensatory damages awarded here.

The law and practical considerations weigh against entering a judgment that would include any of Sawyer's requested injunctive relief. To recap, Sawyer seeks an injunction that would require Erickson to remove "online postings about Sawyer" and forbid Erickson both from publishing "future defamatory" statements regarding Sawyer and filing anything further in this case without representation or court approval. Mem. in Supp. at 2. "In order for a district court to grant a permanent injunction, the plaintiff must show that he will suffer irreparable harm if the injunction is not granted." *United States v. Green Acres Enters., Inc.*, 86 F.3d 130, 132–33 (8th Cir. 1996). Sawyer has not explained why a damages award—particularly the punitive damages component—is not an adequate remedy or deterrent against Erickson publishing future defamatory statements. Sawyer's request for an injunction targeting "future defamatory" statements would be a prior restraint, but Sawyer has not explained why this case poses such extraordinary circumstances to make a prior restraint justified or workable. *See Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 778 (8th Cir. 1994) (recognizing that a movant seeking a prior restraint bears a "'heavy burden'" and that "[c]ourts should tread cautiously when considering injunctive relief against future publication") (quoting *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971)); *see also A.M.P. v. Hubbard Broad., Inc.*, 216 F. Supp. 2d 933, 934 (D. Minn. 2001) ("Courts take a dim view of the prior restraint of expression, and exceptions to the general rule against such prior restraints are recognized only in extraordinary circumstances."). These legal issues aside, practical considerations

cast substantial doubt on the requested injunction's possible effectiveness. The counterclaim includes numerous allegations regarding the extensive republication of Erickson's statements and others' extensive publication of their own, similar defamatory statements. *E.g.*, Countercl. ¶¶ 8, 12–14, 25. In other words, as Sawyer describes things, there is an ever-expanding volume of defamatory information on the Internet, much of it republished by others from Erickson's original statements and much originating from others. Without intending to understate the situation's gravity with respect to Sawyer, it is difficult to envision how the injunctive relief requested as to Erickson might make any practical difference. Finally, though Erickson's litigation conduct has been confounding, the record does not show the presence of factors warranting imposition of a filing restriction. *See Munt v. Schnell*, No. 19-cv-0056 (JNE/HB), 2020 WL 2129722, at *11– 12 (D. Minn. Mar. 12, 2020), *report and recommendation adopted*, 2020 WL 2128666 (D. Minn. May 5, 2020), *aff'd*, No. 20-2117, 2020 WL 7055820 (8th Cir. Oct. 26, 2020) (listing factors to consider in deciding whether to impose a filing restriction).

Sawyer's request for attorneys' fees under 28 U.S.C. § 1927 also will be denied. Section 1927 says: "Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Circuits are split as to whether § 1927 applies to non-lawyer, *pro se* litigants. *See Roberts v. Generation Next, LLC*, 853 Fed. App'x 235, 245 (10th Cir. 2021). The Eighth Circuit has not weighed in on the issue. Assuming Erickson could be sanctioned under § 1927,

the better answer is not to do that.  It is true that Erickson filed several frivolous motions, but these were denied without Sawyer having to respond to them in any meaningful way. It also is true that Erickson has filed many pointless affidavits and exhibits, but Sawyer didn't have to respond to these, either.  If anything, Erickson's default on Sawyer's counterclaim and her failure to respond to the default-judgment motion enabled a more streamlined, less costly resolution of the merits of Sawyer's defamation claim.  In view of the case's procedural history, it is difficult to understand, and Sawyer has not explained, how Erickson's conduct caused him to incur "*excess* costs, expenses, and attorneys' fees." 28 U.S.C. § 1927 (emphasis added).[7]  It also seems worth mentioning that Sawyer too has filed motions and other papers that did not comply with the Rules and that made resolution of the case somewhat more time-consuming.  *See* ECF Nos. 43–46, 54.  All things considered, then, I conclude that the imposition of § 1927 sanctions against Erickson is not warranted.

---

[7]     Sawyer did not seek sanctions in response to Erickson's filing of this case.  *See* ECF Nos. 4, 6.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.      Counter-Claimant Craig Sawyer's motion for a default judgment [ECF No.

61] is **GRANTED IN PART**.

2.      Judgment is awarded to Counter-Claimant Craig Sawyer and against

Counter-Defendant Randi Lynn Erickson in the total amount of $500,000, to bear interest

at the statutory rate from the date of judgment.

3.      The motion is denied in all other respects.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Date: January 12, 2023                              s/ Eric C. Tostrud
                                                    Eric C. Tostrud
                                                    United States District Court